HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID SHAW, et al.,

  Plaintiffs,

  v.

BANK OF AMERICA, N.A., et al.,

  Defendants.

CASE NO. C11-977RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendants' motions to dismiss Plaintiffs' complaint. Dkt. ## 19, 20. On April 24, 2012, the court created a motion calendar to address those motions after the parties were unsuccessful in resolving this case at an early settlement conference. Although Defendants requested oral argument, the court finds oral argument unnecessary in light of its disposition today. For the reasons stated below, the court GRANTS in part and DENIES in part both motions to dismiss. The court sets a March 4, 2013 trial date, and directs the parties to submit a joint status report by November 29 in accordance with this order.

## II. BACKGROUND

The court describes the facts underlying this case as Plaintiffs allege them in their operative complaint. Dkt. # 13. The court uses bare "¶" symbols to cite their complaint and "Ex." to cite the exhibits they attached to it.

ORDER – 1

In May 2008, a fire destroyed the home in Sultan where Plaintiffs David and Charmaine Shaw live. ¶ 4.4. Insurance covered some of their loss, but they still needed around $40,000 to complete the rebuilding. ¶ 4.4. They approached Defendant Bank of America, N.A. ("BofA"),[1] the holder of their home loan, to discuss financing the shortfall. ¶ 4.5. At the time, the loan was just two years old, consisting of a promissory note in which the Shaws promised to repay $261,000 and a deed of trust that made their property the security for the loan. Exs. D, E. In response to the Shaws' inquiries after the fire, BofA advised them to use the Home Affordable Mortgage Program ("HAMP"), a United States Treasury-sponsored measure to give relief to homeowners affected by the decline of the housing market in the late 2000s.

BofA memorialized its participation in HAMP in a Servicer Participation Agreement ("SPA"). Ex. A. The Federal National Mortgage Association, better known as "Fannie Mae," acted as the United States' financial agent for purposes of the SPA. The SPA provided that Fannie Mae would purchase up to nearly $800 million in BofA-serviced home loans, provided that BofA engaged in various loan modification and foreclosure prevention services for the homeowners who took out those loans.

Among the HAMP services that BofA offered were loan modifications subject to Trial Payment Plans ("TPPs"). A TPP, typically available only to homeowners in default on their loans, offered financially qualified homeowners a loan modification subject to making three months of modified payments.[2] Although the Shaws questioned their eligibility for a TPP, given that they were not in default on their loan, BofA assured them that they were eligible. ¶ 4.8.

---

[1] Defendant BAC Home Loans Servicing, LP, a BofA subsidiary, allegedly serviced the Shaws' loan. BofA contends that it merged with this subsidiary, although it is not clear when. The court uses the term "BofA" to refer to BofA and its servicer subsidiary.

[2] The recent opinion in *Wigod v. Wells Fargo Bank, N.A.* provides a concise overview of HAMP, SPAs, TPPs, and the litigation that has surrounded them. 673 F.3d 547, 556-57, 559 n.4 (7th Cir. 2012).

ORDER – 2

BofA offered the Shaws a TPP, which they signed. ¶ 4.6. Although the Shaws do not have a copy of their own TPP, they have attached another TPP to their complaint, alleging that it is in all material respects identical to their own. ¶ 4.6, Ex. C. The TPP required the Shaws to make three monthly payments of about $1,550 and to demonstrate their financial eligibility. ¶¶ 4.6, 4.9. The TPP promised the Shaws that if they did so, they would receive a modified mortgage. Ex. C. BofA told the Shaws in June 2009 to stop making payments until September 2009, then to make their three trial payments. ¶ 4.9. Although BofA requested additional information from the Shaws over the summer of 2009, at no point did it inform the Shaws that there was any problem with that information or their TPP. ¶ 4.9. The Shaws made their TPP payments. ¶ 4.9. BofA informed them that it would send them their final loan modification, but never did. ¶ 4.10.

In November 2009, the Shaws, who hold a Washington contractor license, received word that their license was being revoked because their credit rating had been damaged. ¶ 4.11. The Shaws discovered that BofA had reported them to be in default on their loan since June 2009. ¶ 4.11. BofA never told the Shaws that it would declare them in default. ¶ 4.11. The Shaws made several calls to BofA to attempt to rectify the problem, but were unsuccessful. ¶ 4.12.

In about June of 2010, the Shaws learned that their loan had been assigned to Fannie Mae. ¶ 4.13. Fannie Mae also began to service their loan.[3] ¶ 4.13. Plaintiffs believe that Fannie Mae bought their loan from BofA in accordance with the SPA. ¶ 4.13. When the Shaws attempted to contact Fannie Mae to fix the problems with their loan, they had no success. ¶ 4.14. Moreover, Fannie Mae made a series of conflicting

---

[3] Fannie Mae uses an entity named Seterus, Inc. as its servicer. Seterus was apparently formerly known as IBM Lender Business Process Service. The court uses the term "Fannie Mae" to refer to both the lender and its servicer.

ORDER – 3

representations about the amount that the Shaws owed, but refused to explain the discrepancies. ¶ 4.14.

Late in 2010, Fannie Mae notified the Shaws that it was accelerating the balance due on their note and would commence foreclosure. ¶ 4.15. So far as the record reveals, Fannie Mae never commenced foreclosure proceedings. For reasons no one explains, Fannie Mae transferred the Shaws' loan back to BofA. ¶ 4.17. The complaint is silent as to what has happened since late 2010.

The Shaws filed suit in May 2011, alleging that BofA had breached several contracts. They assert that they are third-party beneficiaries of the SPA, and that BofA breached the SPA. They contend that BofA breached the TPP and the promissory note as well, along with the implied covenant of good faith and fair dealing. They claim that Fannie Mae, as BofA's successor, is liable for the same breaches while it owned and serviced their loan. They assert a promissory estoppel claim against BofA. They contend that both BofA and Fannie Mae violated the Washington Consumer Protection Act (RCW Ch. 19.86, "CPA") not only by breaching these contracts, but by deceiving them as to their participation in HAMP and the TPP and refusing to provide them with information when they requested it. They contend that Fannie Mae and BofA are liable for negligence and that BofA is liable for the tort of outrage.

The court now considers BofA's and Fannie Mae's motions to dismiss the Shaws' complaint for failure to state a claim.

## III.   ANALYSIS

Defendants invoke Fed. R. Civ. P. 12(b)(6), which permits a court to dismiss a complaint for failure to state a claim. The rule requires the court to assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from its allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell*

ORDER – 4

*Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007).  If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief.  *Id.* at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  The court typically cannot consider evidence beyond the four corners of the complaint, although it may rely on a document to which the complaint refers if the document is central to the party's claims and its authenticity is not in question.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).  The court may also consider evidence subject to judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

**A.     The Shaws Cannot Base a Claim on HAMP or the SPA.**

The first contract to which the Shaws point is the SPA between Fannie Mae and BofA.  The Shaws concede that they are not parties to the SPA, but insist that as borrowers they are its third-party beneficiaries.

Rather than dwell on the Shaws' SPA-based claims, the court simply notes that it generally concurs with more than a hundred district court decisions within the Ninth Circuit that have concluded that borrowers have no right of action arising from HAMP and no standing as third-party beneficiaries under any SPA.  *See, e.g.*, *Lucia v. Wells Fargo Bank, N.A.*, 798 F. Supp. 2d 1059, 1066, 1070-71 (C.D. Cal. 2011); *Flores v. Wells Fargo Bank, N.A.*, No. 11-6619JSC, 2012 U.S. Dist. LEXIS 88418, at *12-13 (N.D. Cal. Jun. 26, 2012); *Dodd v. Fannie Mae*, No. S-11-1603JAM, 2011 U.S. Dist. LEXIS 145642, at *33-35 (E.D. Cal. Dec. 19, 2011).  Courts within this District have uniformly reached the same result.  *See*, *e.g.*, *Tran v. BofA*, No. 12-5341RBL, 2012 U.S. Dist. LEXIS 157165, *12-13 (W.D. Wash. Nov. 1, 2012); *Kim v. BofA*, No. 11-296MJP, 2011 U.S. Dist. LEXIS 89510, at *8-9 (W.D. Wash. Aug. 11, 2011).  The court has examined the SPA between BofA and Fannie Mae and concludes that the Shaws are not

ORDER – 5

the intended beneficiaries of that contract. They can raise no claim based on either Fannie Mae's or BofA's failure to comply with the SPA.

**B.     The Shaws Have Plausibly Alleged Breach of their Note or Deed of Trust, or the TPP, or an Oral Contract, or a Claim for Promissory Estoppel.**

Moving beyond claims that depend on the SPA, the Shaws premise many of their remaining claims on breach of a contract, breach of an implied contractual duty, or liability under the contract-like doctrine of promissory estoppel. The court will consider those claims individually, but begins with an overview of the Shaws' contractual relationships with BofA. The court will later consider the Shaws' contractual relationships with Fannie Mae.

**1.     The Shaws Potentially Entered Several Contractual and Contract-Like Relationships with BofA.**

First, no one disputes that BofA was bound to both the Shaws' promissory note and their deed of trust. The note and deed of trust govern the Shaws' obligation to make payments, the noteholder's obligations to honor those payments, and the noteholder's rights in the event of a default. The Shaws allege that at the time they approached BofA about new financing in the wake of the fire, they were in compliance with their obligations under these contracts.

According to the Shaws, rather than simply offering new financing or a traditional refinancing of their loan, BofA suggested that they participate in HAMP. The Shaws were willing to consider the possibility, and they received a TPP along with unspecified other material. The TPP, on its face, did not apply to the Shaws. It required them to certify that they were unable to afford their mortgage payments and were either in default or soon to be in default. Ex. C. The Shaws were not in default or soon to be in default, and they contacted BofA to see if they qualified for HAMP nonetheless. ¶ 4.8. BofA assured them that there was a "disaster" exception to the typical HAMP qualifications, and that the fire was a qualifying disaster. ¶ 4.8. Thus, even before the Shaws signed the

ORDER – 6

TPP, BofA had orally modified it.  Moreover, BofA instructed them to intentionally default on their loan in order to gain the benefits of the TPP.  ¶ 4.9.  BofA did not inform the Shaws that there were any risks inherent in the intentional default, nor that it would report the Shaws' default to credit agencies.  The Shaws stopped paying their loan in accordance with this oral agreement.

At some point, the Shaws signed the TPP and provided BofA the financial disclosures and other information that the TPP required.  The TPP had a blank for BofA to provide its own signature, but there is no allegation that BofA signed it.  BofA does not deny that it signed it, nor could it do so on a motion to dismiss.  Nonetheless, the Shaws allege that BofA accepted the modified payments set forth in the TPP and assured them that they otherwise met the conditions stated in the TPP.  Thus, it is plausible that BofA signed the TPP.  It is also plausible that even if it did not sign the TPP, its actions in accordance with the TPP prevent it from denying that it assented to its terms.

The Shaws allege that they completed their trial payments, met all other conditions of the TPP (as orally modified), and that BofA informed them that they had satisfied the TPP and would receive their modified note and deed of trust.  ¶ 4.10.  BofA also told them to continue making the same monthly payment established in the TPP, even after the TPP trial period had expired.  BofA never followed through on its promise to deliver modified loan documents.

The Shaws and BofA were either bound or at least arguably bound to the note, the deed of trust, the TPP, and possibly one or more oral contracts.  Under Washington law, each of these contracts carries with it an implied covenant of good faith and fair dealing that requires the contracting parties to cooperate with an eye toward achieving full performance of the contract.  *Metro. Park Dist. v. Griffith*, 723 P.2d 1093, 1100 (Wash. 1986).

ORDER – 7

## 2. The Shaws Have Plausibly Stated a Claim for Breach of the TPP.

Beginning with the TPP, the court first considers whether BofA agreed to be bound to it. The Shaws agreed when they signed the TPP and sent it to BofA. The TPP describes itself as an "Offer," but it also declares that it is not effective until "both [the borrower] and the Servicer sign it" and the "Servicer provides [the borrower] with a signed copy . . . ." Ex. C. The Shaws allege that they never received a signed copy of the TPP (¶ 5.3(c)), although BofA does not deny that it signed it. Accepting the Shaws' allegations, BofA did not honor the TPP's requirement that it either provide them with a signed copy of the TPP or "send [them] written notice that [they] do not qualify for the Offer." Ex. C. Moreover, the Shaws plausibly allege that after they signed the TPP and returned it to BofA, BofA took actions consistent with performing its obligations under the TPP. Among other things, it advised the Shaws to begin making their modified payments in accordance with the TPP, and after accepting those payments, advised the Shaws that they had completed their end of the bargain and would soon receive a modified note and deed of trust. Thus, although there are no allegations that the BofA entered the TPP by the terms of the instrument itself, its course of performance could plausibly support a finding that it entered the TPP. That performance could also plausibly estop BofA from denying that it entered the TPP. In any event, BofA has yet to articulate a tenable argument that it can deny that the TPP binds it despite a series of acts in which it accepted the Shaws' performance under the TPP.

The TPP itself is muddled as to whether it is an enforceable promise to modify the Shaws' loan. The TPP begins with a simple promise:

> If [the borrower] is in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

ORDER – 8

Ex. C. This promise is easy to understand, and although it imposes certain requirements on the borrower, it does not suggest any way for BofA to avoid the promise at its whim. Section 3, which this initial clause mentions, reiterates the same simple promise:

> If [the borrower] compl[ies] with the requirements in Section 2 and [the borrower's] representations in Section 1 continue to be true in all material respects, the Servicer will send [the borrower] a Modification Agreement for [the borrower's] signature which will modify [the borrower's] Loan documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date.

Ex. C. These clauses are unambiguous promises to provide a modified loan, subject to certain conditions. The Shaws allege not only that they met those conditions, but that BofA repeatedly informed them that they met those conditions.

BofA seizes on two other clauses in the TPP that, in its view, make illusory its promise to modify the Shaws' loan. Those clauses require the borrower to acknowledge as follows:

> F.  If prior to the Modification Effective Date, (i) the Servicer does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required . . . ; or (iii) the Servicer determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this [TPP] will terminate. . . .
>
> G.  I understand that the [TPP] is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii), I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed. . . .

The Shaws allege that they met all of their obligations under the TPP. BofA insists, however, that the clauses that condition the ultimate modification of the loan on actually providing an executed "Modification Agreement" mean that it can bow out of the TPP simply by deciding, for any reason or for no reason at all, that it will not deliver a Modification Agreement.

The court concludes, at least for purposes of resolving these motions to dismiss, that the TPP was an enforceable promise to provide a modified loan so long as the Shaws

ORDER – 9

complied with the TPP's conditions. BofA could not escape the TPP simply by refusing to provide an executed modification agreement. Adopting BofA's construction would reduce the TPP to the following "agreement": "BofA will provide you with a modified loan unless BofA decides that it doesn't feel like it." The court agrees with at least one other court that finds this interpretation untenable:

> Read literally, th[e] language [in subclause F] would suggest that even if all other conditions are satisfied, a lender has no obligation to provide a loan modification agreement unless it in fact provides a modification agreement. As noted in the prior order, this provision conflicts with the clear tenor of the remainder of the document and would render the other agreement promises illusory. At least at the pleading stage, a reasonable inference can be drawn that the language was merely intended to reemphasize to borrowers that their underlying loan agreements cannot and will not be deemed modified or no longer enforceable until and unless final modification agreements are fully executed. While the provision admittedly gives rise to an ambiguity, it does not permit a determination as a matter of law that the lender has unbridled discretion as to whether or not it will provide an executed copy of a modification agreement upon satisfaction of all other conditions of the TPP.

*Gaudin v. Saxon Mortgage Servs., Inc.*, No. C11-1663RS, 2011 U.S. Dist. LEXIS 132957, at *11-12 (N.D. Cal. Nov. 17, 2011). At least at this stage, the Shaws have plausibly alleged that the TPP is an enforceable contract and that BofA breached it.

Before leaving the TPP, the court observes that courts around the country have considered whether the TPP is an enforceable contract. There are dozens of district court decisions addressing this issue in the Ninth Circuit alone, although none from Washington's state or federal courts. The court declines to provide a lengthy overview of those decisions, but it notes that almost all of them have analyzed the TPP under traditional principles of state contract law. The only circuit court of appeals to consider a TPP has rejected, albeit by applying Illinois law, every argument that BofA makes,[4] along with several other arguments from the defendant loan servicer. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560-66 (7th Cir. 2012). A few courts have suggested

---
[4] Among other things, *Wigod* rejects the argument that BofA belatedly raised in its reply brief that the TPP was invalid for lack of consideration. 673 F.3d at 563-64.

ORDER – 10

that because a TPP is a component of HAMP, and HAMP provides no cause of action, that the TPP itself provides no cause of action. Fannie Mae mentioned a few of those cases in a cursory attack on a TPP that does not bind Fannie Mae. The court will not decide at this stage if HAMP overrides generally applicable state contract law. *But see Wigod*, 673 F.3d at 559 n.4 (rejecting notion that HAMP limits application of state contract law to TPPs). For the time being, the court merely advises Defendants that if any of them wish to advance that argument, they will need to do a substantially better job than they have done in the motions before the court.

### 3. The Shaws Have Plausibly Stated Claims Based on Defendants' Oral Assurances Regarding the Payment of Their Loan.

The TPP was not itself a modification of the Shaws' loan, it was merely a promise of a modified loan. The Shaws allege, however, that BofA instructed them to continue paying the reduced payments specified in their TPP while they awaited the modified loan documents. The Shaws complied with BofA's instructions. But instead of providing modified loan documents, BofA transferred the Shaws' loan to Fannie Mae.

At a minimum, BofA's oral representations constituted a waiver of its remedies under the note and deed of trust. Those representations may have constituted more than a mere waiver—they may have bound BofA to an oral contract.[5] The court need not decide that issue now. It suffices to conclude that at the time BofA transferred their loan to Fannie Mae, the Shaws have plausibly alleged that they were making reduced loan payments in accordance with BofA's assurance that those payments would suffice to meet the Shaws' obligations.

BofA suggests that the Shaws' deed of trust nullifies its oral representations. It is mistaken. The clause to which it points declares that the borrower "shall not be released

---

[5] In a single sentence in its motion, Fannie Mae suggests that Washington's statute of frauds would bar any claim based on an oral contract or oral modification of the contract. That single sentence did not cite Washington's statute of frauds, RCW Ch. 19.36, it instead cited one Washington case without a pinpoint cite. At this stage, no Defendant has adequately articulated an argument based on the statute of frauds. The court will not consider this issue further today.

ORDER – 11

from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing." Ex. E at ¶ 13. Read in its full context, however, the clause applies only to transfers of the borrower's interest under the deed of trust to a successor in interest. *Id.* In other words, it applies only to a complete release of the borrower from the deed of trust, not mere modifications to the deed. BofA ignores, moreover, that Washington law gives no effect to contract clauses purporting to bar oral modifications. *Pac. NW Group A v. Pizza Blends, Inc.*, 951 P.2d 826, 828-29 (Wash. Ct. App. 1998).

In addition, accepting the facts as the Shaws allege them, BofA breached the implied covenant of good faith and fair dealing inherent in the note and the deed of trust. BofA told the Shaws that it would waive any default and remedies for default if the Shaws complied with BofA's instructions. The Shaws alleged that they complied with the instructions and BofA declared them in default. If the Shaws prove these allegations, they will have proven a breach of the implied covenant of good faith, and likely a breach of one or more of the contracts the court has discussed in this section.

Finally, the court finds no merit in BofA's assertion that the Shaws have not pointed to a promise sufficient to support a claim for promissory estoppel. See *Havens v. C&D Plastics, Inc.*, 876 P.2d 435, 442 (Wash. 1994) (stating elements of promissory estoppel claim). Again, the Shaws assert that BofA promised them that if they made trial payments and satisfied other conditions, they would receive a modified loan. They reduced their payments in reliance on BofA's promise, and then suffered damage not only because they did not receive the modified loan BofA promised them, but because BofA declared them in default in violation of its promise.

### 4. The Shaws Have Only a Limited Contractual Relationship with Fannie Mae.

The Shaws' contractual claims against Fannie Mae are more limited. Fannie Mae did not enter a TPP with the Shaws or make them any promises regarding a modified

ORDER – 12

loan. Although the Shaws have plausibly alleged that BofA agreed to modify their loan, there is no dispute that the loan had not been modified when it passed to Fannie Mae. Similarly, although the Shaws have plausibly alleged that BofA orally agreed to reduced payments, there is no plausible allegation that Fannie Mae adopted those agreements. Although the Shaws offer conclusory assertions that Fannie Mae took on all of BofA's contractual obligations, the only plausible assertion is that Fannie Mae took on only the obligations of the note and deed of trust. Indeed, the Shaws admit that Fannie Mae told them from the outset that their loan had not been modified and that they were in default. ¶ 4.13.

The Shaws do, however, plausibly allege that Fannie Mae breached the note and deed of trust by giving them inconsistent representations about the amount they owed when they were declared in default. These representations might also give rise to a breach of the implied covenant of good faith and fair dealing. But beyond these claims flowing from the note and deed of trust, the Shaws have no contract or promissory estoppel claims against Fannie Mae.

Before leaving the Shaws' contract claims, the court notes that it has largely declined the parties' invitations to decide precisely which acts breached which contracts or promises. BofA, for example, asked the court to decide precisely which of its acts breach its contractual obligations, pointing to a list of specific breaches that the Shaws provided at paragraphs 5.3(i)-(xi) of their complaint. Although the court typically prefers to provide more detailed rulings, the parties' briefs lack the detailed legal argument to support a more detailed ruling. The court cannot forecast the future course of this litigation, but it would not be surprised if the parties raised other legal arguments based on the Shaws' contractual relationships, or renewed some of the arguments they made in cursory fashion in these motions. If so, the court urges the parties to abandon the scattershot method they have too frequently employed in these motions.

ORDER – 13

**C.      The Shaws Have Plausibly Alleged a CPA Claim.**

The court now turns from the Shaws' contract claims to their sole statutory claim: that Defendants violated Washington's CPA. A CPA claim requires an unfair or deceptive act or practice that occurs in trade or commerce and impacts the public interest. *Bain v. Metro. Mortgage Group, Inc.*, 285 P.3d 34, 49 (Wash. 2012).   The unfair or deceptive act must cause an injury to a plaintiff in her business or property. *Id.*

Defendants' insistence that the Shaws have not plausibly alleged an unfair or deceptive act is baffling. The Shaws allege that BofA told them to stop paying their loan but did not tell them that they would be declared in default. The implicit promise was that BofA would not treat their nonpayment as a default. BofA also told the Shaws that they would receive a modified loan if they made trial payments. These statements were false. BofA also stonewalled the Shaws' efforts to remedy the problems that BofA's misrepresentations caused. Fannie Mae, for its part, made inconsistent representations about the amount the Shaws owed. To be "unfair or deceptive" within the meaning of the CPA requires only acts that have a capacity to deceive. *Bain*, 285 P.3d at 50. Accepting the Shaws' allegations as true, Defendants engaged in a host of deceptive actions.

As to the remaining elements of a CPA claim, the actions of national banks in administering a program affecting thousands of Washington homeowners occur in trade or commerce and have a public interest impact. There is no question that the Shaws suffered injuries to their business or property as a result of Defendants' deception. Had BofA not deceived them, the Shaws would have simply continued paying their mortgage, and thus avoided the adverse financial consequences that resulted from heeding BofA's instructions. Had BofA not deceived them, they could have avoided the consequences of default.

Defendants argue that breaches of contract cannot support a CPA claim. They cite no authority for this proposition. It may well be that the Shaws' CPA claim is in some ways duplicative of their contract claims, but that is no reason to dismiss it. In the event

ORDER – 14

that one or more of their contract claims fail, moreover, their CPA claim may serve as an alternative means to hold Defendants liable for deceptive acts that were not a breach of contractual duties.

**D.    The Shaws Have Not Plausibly Alleged Claims for Negligence or Outrage.**

In contrast with their claims grounded in contract, the Shaws' tort claims have no legal foundation. They assert that BofA and Fannie Mae were negligent, but they cannot point to a source of a legal duty that BofA or Fannie Mae owed them. Indeed, they did not even mention their standalone negligence claim in their opposition to the motions to dismiss. The Shaws' relationship with BofA and Fannie Mae was contractual. Tort duties do not flow from contractual relationships—a party must point to an independent tort duty. *Eastwood v. Horse Harbor Found., Inc.*, 241 P.3d 1256, 1261-62 (Wash. 2010). Because they point to no independent duty Defendants owed them, the Shaws cannot sustain a negligence claim.[6]

The Shaws also fail to state a claim against BofA for the tort of outrage. That claim, also known as intentional infliction of emotional distress, requires them to prove three elements: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff." *Robel v. Roundup Corp.*, 59 P.3d 611, 619 (Wash. 2002). To satisfy the first element, the plaintiff must prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted). A court need not permit a jury to resolve an outrage claim if it determines that reasonable minds could not differ on whether the challenged conduct was sufficiently outrageous. *Id.; Dicomes v. Washington*, 782 P.2d 1002, 1013 (Wash. 1989).

---

[6] BofA guessed, based on the Shaws' complaint, that they might be asserting a negligent misrepresentation claim. The court does not share that interpretation of the complaint. In any event, the Shaws said nothing in their response to the motions to dismiss about a negligent misrepresentation claim. Even assuming they intended to state such a claim, they abandoned it.

ORDER – 15

In this case, the court concludes that the Shaws' allegations describe conduct that is beyond the scope of the tort of outrage. The Shaws contend that because of BofA's actions, they have lived in their garage for years because they have been unable to rebuild their home. The court observes that it was a fire that deprived the Shaws of their home; BofA's actions have (at most) prolonged their stay. Although reasonable people might describe BofA's conduct in this case as "outrageous," they would do so in the colloquial sense of the word. Although BofA may have acted "outrageously" in the context of treating the Shaws poorly in their business relationship, the court concludes that the tort of outrage is not intended to provide a remedy for BofA's conduct in this case. *See Steinbock v. Ferry County Pub. Util. Dist. No. 1*, 269 P.3d 275, 282 (Wash. Ct. App. 2011) (affirming dismissal of outrage claim, recognizing that trial court must serve a "gatekeeping role" in determining what qualifies as outrage).

## IV.  CONCLUSION

For the reasons previously stated, the court GRANTS in part and DENIES in part Defendants' motions to dismiss. Dkt. ## 19, 20. The clerk shall TERMINATE the motion calendar that the court created on April 24.

The court sets March 4, 2013 trial date. This is the date that the Shaws requested in the most recent joint status report. Dkt. # 32. The court recognizes that this case has been derailed for some time, initially by the parties' unsuccessful early settlement efforts, and later because the court's competing priorities kept it from addressing these motions to dismiss more quickly. The court has no idea what discovery the parties have completed or if they still believe they can be ready for trial in March. An early March trial date will require the parties to complete discovery and file dispositive motions no later than early January, which may or may not be realistic. The court will refrain from imposing a pretrial schedule for the time being. The parties shall meet and confer and submit a joint status report no later than November 29, 2012. In that report, they must

ORDER – 16

update the court on the status of discovery in this action and the parties' views regarding the trial date. The court strongly prefers to resolve this case as quickly as is reasonably possible.

DATED this 14th day of November, 2012.

*Richard A. Jones*

The Honorable Richard A. Jones
United States District Court Judge

ORDER – 17